```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

BUILDING SERVICE 32BJ HEALTH FUND,

                        Plaintiff,                      14-CV-09581 (SN)

              -against-                      **OPINION AND**
                                                                         **ORDER**

HUGHES CONTRACTING INDUSTRIES LTD.,

                        Defendant.

-----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

      Plaintiff Building Service 32BJ Health Fund (the "Fund"), a multi-employer benefit fund, brings an action under Section 502(g)(2) and 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(g)(2), 1145, to collect allegedly delinquent benefits contributions from Hughes Contracting Industries Ltd. ("Hughes"), a company performing steel and metal work in the New York area. The Fund alleges that three audits of Hughes's payroll covering the period from January 1, 2009, to May 31, 2015, uncovered 26 eligible employees for whom no benefits were paid. For its part, Hughes contends that a decades-long history of negotiations plainly indicates that SEIU Local 32BJ represented a bargaining unit of welders only, and that there is no basis for the Fund's sudden conclusion that it was entitled to contributions from all of Hughes's workers.

      Because Hughes filed a bankruptcy petition on April 5, 2016, the case was automatically stayed pursuant to 11 U.S.C. § 362(a). On February 8, 2017, the Honorable Robert D. Drain, U.S. Bankruptcy Judge for the Southern District of New York, vacated the automatic stay for the sole purpose of allowing the Fund's motion for summary judgment to be adjudicated through the

entry of final judgment. ECF No. 52-1. Accordingly, the stay having been vacated, the Court proceeds to consider the Fund's motion for summary judgment on its merits.

Because the Collective Bargaining Agreement ("CBA") between the Fund and Hughes clearly and unambiguously requires contributions for all employees and makes no mention of Hughes's alleged limitation of the bargaining unit to welders only, the Court GRANTS summary judgment to the Fund.

## BACKGROUND

### I.   CBA Between the Fund and Hughes

The following facts are undisputed except where otherwise indicated. The text of the CBA at issue stems from an agreement signed between the Fund and Hughes on May 31, 2002. Section 1(a) of this agreement states that "the Employer recognizes the Union as the sole and exclusive bargaining agency . . . [for all] conditions pertaining to employment of all employees." ECF No. 35-1 at 1. Section 2(a) states that "all persons, except partners, which shall not exceed two in number, and except supervisory and office personnel, shall become members of the Union . . . ." Id. at 2. Section 19 governs the establishment of an "insurance plan and welfare fund . . . for the benefit of disabled, sick and injured members of the Union and their dependents." Id. at 5. Hughes commits to paying a certain sum "per employee" to the Service Employees North Health Benefit Fund before the tenth day of every month. Id. at 5. Hughes also takes on a commitment to contribute certain sums for pension and legal services funds "for each employee." Id. at 6.[1] Section 8, which governs wage payments, references specific minimum wages of $10.00 an hour for mechanics and $8.00 an hour for helpers. Id. at 2.

---

[1] The contributions allegedly owed to the 32BJ North Pension Fund and the 32BJ North Legal Services Fund and their Trustees are the subject of related case 14-CV-9755 (SN). The automatic stay imposed by 11 U.S.C. § 362(a), however, has not been lifted in that case.

2

The CBA was renewed on July 1, 2005, until June 30, 2008. ECF No. 35-2. No material changes were made to the agreement, except that the plan to be contributed to was changed to the Tri-State Preferred Plan, and the monthly contribution amounts were adjusted. ECF No. 35-2. This CBA was renewed on July 1, 2008 until June 30, 2011, without changes. ECF No. 35-3. Finally, it was renewed again on July 1, 2011, until April 30, 2015, at which point the plan to be contributed to changed to the Building Service 32BJ Health Fund, the current plaintiff in the litigation. ECF No. 35-4. This contract refers to contributions for "each eligible employee" rather than "each employee" or "per employee." Id. The CBA expired on April 30, 2015, and has not been renewed. ECF No. 35, Orsmby Aff. ¶ 8.

The parties do not dispute that a valid CBA existed with the text outlined above during the relevant dates at issue in this case. Hughes does, however, vigorously dispute the allegation that the CBA, and, as relevant, its benefits fund contribution provisions, applied to all of its employees. According to company president Anthony Russo, Hughes had a mature, long-standing bargaining relationship with SEIU, starting in the early 1980s with SEIU Local 32E, AFL-CIO, and continuing with SEIU Local 32BJ after Local 32E was merged with Local 32BJ around 2001. ECF No. 53, Russo Aff. ¶ 4. At the moment the initial agreement was signed with 32E, Russo contends "that there was a clear and unmistakable agreement and understanding that Local 32E would represent my employees employed as welders," even though the Union was aware of other job categories employed by Hughes. Id. at ¶ 5. Russo stated that "throughout the 35-year period there was an understanding and practice between Hughes and 32E or 32BJ, and reflected in the [CBAs], remittance forms . . . and payments that Hughes made that the job classification coverage was only steel welders who 32BJ or 32E sought to represent." Id. at ¶ 8.

3

Russo argues that when the CBA was signed with 32BJ, he simply executed a Memorandum of Agreement that continued all terms of the prior agreement except for a change in the amount of wages paid to the welders and the amount of fund contributions, and there was no discussion of the bargaining unit. Id. ¶ 9. In total, Russo estimates that the number of employees covered by the agreement ranged between six and eight, and Hughes would pay benefits contributions for these employees only. Id. ¶ 10. To his knowledge, 32E or 32BJ never tried to achieve majority status among the other employees and only sent remittance forms for payment for these employees. Id. ¶¶ 10–11.

## II.     The Audit of Hughes's Contributions to the Fund

In accordance with the Fund's trust instruments and practice, the Fund conducted three payroll audits of Hughes covering the aggregate period of January 1, 2009, to May 31, 2015. ECF No. 35, Ormsby Aff. ¶ 10. The first audit was performed for the period between January 1, 2011, and May 31, 2013, and found a deficiency of $248,400.54 in contributions. Ormsby Aff. ¶ 11; ECF No. 35-5. The second and third audits, which were conducted simultaneously, covered the periods January 1, 2009, through December 31, 2010, and June 1, 2013, through May 31, 2015, respectively. Ormsby Aff. ¶ 12. The 2009-2010 audit found a delinquency of $200,872. Id; ECF No. 35-6. The 2013-2015 audit found a delinquency of $349,857. Id. at ¶ 13, ECF No. 35-7. Therefore, the total amount of principal allegedly owed as a result of these three audits is $799,129.54.

Hughes argues that it "immediately and fully complied" with the payroll audits, as it has in the past, and was blindsided when "[i]nexplicably the auditors returned reports seeking 'wall-to-wall' contributions for all Hughes employees." ECF No. 53, Russo Aff. ¶ 17. Hughes disputes the audits' conclusions insofar as it argues that it had no obligation to contribute for the workers

identified in the audit. Id. Hughes also disputes that the employees in question were performing "covered work": instead, Hughes argues that many of them performed work on prevailing wage jobs that did not require a signed union contract and were paid wages and supplemental benefits according to the prevailing wage for the particular year. Id. at ¶ 6. Hughes has not, however, disputed or contested the underlying facts reported by the audits; namely, the names of specific employees, their periods of time on Hughes's payroll, the units of time reported by Hughes to the Fund for coverage, or the dollar amount due on behalf of each employee, had they been reported to the Fund.

## ANALYSIS

### I. Legal Standards

#### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party bears the initial burden of establishing that there are no material facts in dispute and must provide "affirmative evidence" from which a factfinder could return a verdict in its favor. Id. at 257. Then "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not

extend to issue-resolution." Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir. 1994).

In determining whether summary judgment is appropriate, the court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the non-moving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). Summary judgment is improper if "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. . . ." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). To create a disputed fact sufficient to deny summary judgment, the non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible. . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Instead, the response "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation and internal quotation marks omitted).

### B. Statutory Framework

The obligations at issue in this case stem from Section 515 of ERISA, which provides as follows:

> Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.

29 U.S.C. § 1145.

"The liability created by [ERISA] § 515 may be enforced by the trustees of a plan by bringing an action in federal district court pursuant to [ERISA] § 502." Laborers Health & Welfare Trust v. Advanced Lightweight Concrete Co., 484 U.S. 539, 547 (1988); see 29 U.S.C. § 1132(a)(3) (allowing for civil actions brought by fiduciaries to enforce the provisions of

6

ERISA or the plan); 29 U.S.C. § 1132(e)(1) (providing exclusive federal jurisdiction for such claims).

The Court of Appeals for the Second Circuit has recognized that an employer's affirmative defenses to a Section 515 action are very limited. See Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir. 1990) ("Our research has disclosed only two defenses recognized by the courts: (1) that the pension contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable).") (citations omitted); N.Y. State Teamsters Conference Pension & Ret. Fund v. United Parcel Serv., Inc., 382 F.3d 272, 280 (2d Cir. 2004) ("[We] have repeatedly barred employers from invoking as a defense an oral or otherwise unwritten agreement with the union 'not to enforce the [written] terms of the collective bargaining agreement' with respect to multiemployer plan contributions.") (citing Benson, 907 F.2d at 314). While third-party beneficiaries are generally subject to the defenses that the promisor could raise in a suit by the promisee, the courts and Congress granted funds special protection under the theory that benefit funds "must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations." Benson, 907 F.2d at 314.

Benefit funds are not, however, "entitled to enforce a nonexistent contractual obligation." DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 653–54 (2d Cir. 1994) (citation omitted). To prevail on an ERISA collection claim, the Fund must in the first instance establish the existence and scope of the employer's contractual obligation. Cement & Concrete Workers Dist. Council v. Lollo, 35 F.3d 29, 36 (2d Cir. 1994); see also Trustees of Bricklayers & Allied Craftworkers v. Charles T. Driscoll Masonry Restoration Co., 165 F. Supp. 2d 502, 510 (S.D.N.Y. 2001) (for summary judgment under ERISA Sec. 515, plaintiffs "must show that the

Agreement creates an unambiguous contractual obligation on the defendants to make contributions pursuant to the contended provisions.").

### C. Principles of Contract Interpretation in the Collective Bargaining Context

When interpreting a CBA, courts apply the traditional rules of contract interpretation, provided that they are consistent with fair labor policies. Aeronautical Indus. Dist. Lodge v. United Techs. Corp, 230 F.3d 569, 576 (2d Cir. 2000). When provisions in the agreement are unambiguous, they must be given effect as written. See Bozetarnik v. Mahland, 195 F.3d 77, 83 (2d Cir. 1999). Only when provisions are ambiguous may courts look to extrinsic factors—such as bargaining history, past practices, and other provisions in the CBA—to interpret the language in question. See United Mine Workers v. LTV Steel Co., 891 F.2d 1034, 1038 (2d Cir. 1989); see also Roca v. Guardian Transp. Co., No. 99-CV-4996 (LMM)(HBP), 2002 WL 31082959, at *5 (S.D.N.Y. Sept. 16, 2002) ("[W]hile extrinsic evidence may be used to shed light on ambiguous collective bargaining agreements, it cannot be used when the terms of the agreement are unambiguous."). Moreover, extrinsic evidence may not be used "to establish the ambiguity of a facially unambiguous collective bargaining agreement." Keane v. Zitomer Pharmacy, Inc., No. 06-CV-5981 (RJS)(KNF), 2010 WL 624285, at *3 (S.D.N.Y. Feb. 23, 2010).

"[T]he determination of whether a contract contains ambiguous language is a question of law." Demolition Workers Union v. Mackroyce Contracting Corp., No. 97-CV-4094 (LMM), 2000 WL 297244, at *3 (S.D.N.Y. Mar. 22, 2000) (citation omitted). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." In re Delta Airlines Inc., 313 F. App'x 430, 434 (2d Cir. 2009) (summary order) (citation omitted). By contrast, contract language "is unambiguous when it has a definite and precise meaning and

8

where there is no reasonable basis for a difference of opinion." Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997).

"Words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted). "'[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" Id. (quoting Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003)). "A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties." Riverside South Planning Corp. v. CRP/Extell Riverside, L.P., 60 A.D.3d 61, 66 (1st Dep't 2008).

## II. Application

### A. Liability

In this case, Hughes has not raised one of the two affirmative defenses that the Court of Appeals has authorized for actions under ERISA Section 515: that the collective bargaining agreement in question was wholly void or that the pension contributions themselves were illegal. Instead, Hughes argues that genuine issues of fact precluding summary judgment exist as to the scope of work and the bargaining unit covered by the CBA and the Fund's audit calculations. In support of this argument, Hughes points to the testimony of its president Anthony Russo, who states that the bargaining unit only covered welders over decades of its existence and remittance forms from the Fund requesting contributions for only welder employees.

In order to consider Mr. Russo's characterization of the bargaining history and course of performance of the CBA—evidence that is indisputably extrinsic to the four corners of the

contract itself—the Court must first conclude that the relevant language of the CBA is ambiguous. The 2002 Agreement, which serves as the base contract for the later modifications by Memoranda of Agreement in 2005, 2008, and 2011, is unambiguous and not reasonably susceptible to the reading that Hughes urges: that the bargaining unit was limited to welders only.

Section 1(a) of the contract indicates that the Employer recognizes the Union "as the sole and exclusive bargaining agency, for the purpose of bargaining in respect to rates of pay, wages, hours of employment and all other conditions pertaining to employment of <u>all</u> employees." ECF No. 35-1 at 1 (emphasis added). Section 1(b), in turn, requires "all employees covered by this Agreement" and "all employees hereafter hired" to either remain members of the Union as a condition of employment or become members within 31 days of its effective date. <u>Id.</u> Section 2(a) states Hughes's agreement that "all persons, except partners, which shall not exceed two in number, and except supervisory and office personnel, shall become members of the Union . . . ." <u>Id.</u> at 2. Section 19, accordingly, requires contributions to the Fund in question on a "per employee" basis. <u>Id.</u> at 5.

Whatever the reality of the parties' collective bargaining relationship may have been, these terms are unambiguous and flatly incompatible with Hughes's argument that the bargaining unit consisted of welders only. The terms "all employees" in Section 1(a) and "all persons" in Section 2(b) are not reasonably susceptible to mean "welders only," or to any meaning other than "each and every employee of Hughes." And the exclusion of "supervisory and office personnel" in Section 2(b) would not be intelligible if the parties intended that only welders be in the bargaining unit; presumably, no welders are office personnel, and very likely none is a partner in the firm. Finally, Section 8, which is the only section that refers to specific categories of

employees, sets separate minimum wages for "mechanics" and "helpers," neither of whom are welders.

Hughes's essential argument is similar to the employer's argument explicitly rejected by the Court of Appeals in Benson. In that case, because the employer could not establish that the CBAs in question were ambiguous themselves, it argued that they were "invalid and unenforceable because they had been 'abandoned' by the union, *i.e.,* [the employer] had not complied with several terms of the agreements and the union had acquiesced in the noncompliance." Benson, 907 F.2d at 311–12. There, the Court of Appeals concluded that, even if a CBA were deemed to be wholly abandoned, this would not release the employer's obligation to make benefits contributions because "'nothing in ERISA makes the obligation to contribute [to a benefit plan] depend on the existence of a valid collective bargaining agreement.'" Benson, 907 F.2d at 315 (citing Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148, 1153 (7th Cir. 1989)). The Court of Appeals also rejected the possibility of a union's lack of majority status as a defense. Id. at 316. Noting that "the result in this and similar cases may seem quite harsh . . . [because an employer may have to] contribute to the Funds without a preliminary determination that there exists a collective bargaining agreement that would be recognized as valid under labor-management relations law," the Court of Appeals found that its task was to "enforce Congress' desire that benefit plans be able to rely on the written agreements presented to them." Id.

In this case, Hughes does not argue that the contract was wholly abandoned, but only that SEIU 32BJ never attempted to enforce the provisions entitling it to the Union membership of all of its employees and never achieved majority status among non-welder employees. Whatever the

merits of such arguments under the labor law, they are plainly precluded as defenses under ERISA by Benson and its progeny.

Indeed, the factual scenario in this case is nearly identical to that presented in Keane v. Zitomer Pharmacy, Inc., No. 06-CV-5981 (RJS)(KNF), 2010 WL 624285 (S.D.N.Y. Feb. 23, 2010). In that case, a defendant who owned a three-story department store with a pharmacy on the first floor, a toy store on the second floor, and a clothing store on the third floor argued that it was required to make contributions only to pharmacy employees on the basis of an oral agreement that only they would be covered by the CBA and that health benefits to the other employees would be provided directly by the store. Id. at *1. The actual language in the CBA, however, required contributions for "each employee who is employed within the bargaining unit . . . regardless of whether such employee is a member of the union" and defined the union as the "sole bargaining agent for all employees, excluding executives, non-working supervisors, and armed guards." Id. at *2. Although the agreement provided that all employees had to become union members within 30 days of employment, only the pharmaceutical employees actually joined the union. Id. at *3.

On these facts, the Keane court found that "[t]here simply is no ambiguity on the face of the agreement" and rejected the defendant's attempts to bring in evidence about the intent and past dealings of the parties and the benefit funds' prior conduct. Id. at *4. Accordingly, notwithstanding the presence of extrinsic evidence that might otherwise raise a genuine issue of material fact for trial, the court granted summary judgment for the plaintiff relying on the unambiguous contract language. Id. at *5.

Whatever the bargaining history of the parties may have been, the Court finds that as a matter of law, the CBA unambiguously requires Hughes to make contributions on behalf of all

employees (excepting partners and supervisory and office personnel), and not only welders. Accordingly, any consideration of extrinsic evidence would be improper, and the Fund is entitled to summary judgment on their ERISA Section 515 claim.

    **B.**        **Damages**

In addition to disputing the scope of its benefit plan contribution obligations, Hughes also disputes the auditors' findings as resting upon unsupported factual and legal assumptions that the employees in the audit performed work covered by the CBA, thus creating a genuine dispute of material fact as to the amount of damages. Specifically, Hughes contests that the Fund offered no evidence about the amount of "covered work" performed during the relevant periods of the audit. Hughes president Anthony Russo states that "[d]uring the period of the agreement with 32E and 32BJ . . . Hughes did not perform on other jobs that were considered union job[s] – jobs that required a signed union contract. Hughes performed work on prevailing wage jobs. On those jobs, the workers were paid wages and supplemental benefits according to the Prevailing Wage for the particular year." ECF No. 53, Russo Decl. ¶ 6.

Once again, Hughes's arguments are made without reference to the actual text of the CBA, which must govern the Court's analysis. Simply put, there are no references to "covered work," "non-covered work," or "prevailing wage jobs" in the CBA. Instead, the bargaining unit is defined to include all employees except partners, supervisors, and office staff. To the extent that it is defined in the contract, the scope of work is that Hughes is required to "employ members of the Union to perform the duties and work incidental to general contracting." ECF No. 35-1 at 1. As the Fund points out, Hughes does not dispute any of the actual data uncovered in the audit, including the names of specific employees, their periods of time on Hughes's payroll, the units of time reported by Hughes to the Fund for coverage and the dollar amounts

due on behalf of each employee. A plain reading of the contract makes no distinction between "union jobs" and "prevailing wage jobs" or any other kind of employment. Therefore, Hughes has failed to raise a genuine issue of material fact requiring trial with respect to the quantum of damages owed, and the Fund is entitled to summary judgment for the full amount represented in the audits.

### III. Calculation of Damages

Benefit funds' recovery of delinquent contributions under Section 515 is governed by 29 U.S.C. § 1132(g)(2), which states that:

> [i]n any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—
>
>    (A) the unpaid contributions,
>    (B) interest on the unpaid contributions,
>    (C) an amount equal to the greater of--
>        (i) interest on the unpaid contributions, or
>        (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>    (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>    (E) such other legal or equitable relief as the court deems appropriate.

Therefore, employers found liable for violating 29 U.S.C. § 1145 are responsible not only for the dollar amount of the contributions themselves, but also interest, liquidated damages in an amount that is at least equal to that interest, and attorney's fees and costs. Such damages enhancements are mandatory if liability is proven. Laborers Health & Welfare Trust, 484 U.S. at 547. Interest on the unpaid contributions "shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of the Internal Revenue Code of 1986 [26 U.S.C. § 6621]." 29 U.S.C. § 1132(g)(2).

The Fund's audits demonstrate that the total amount of unpaid contributions discovered by their three audits is $799,129.54. The Fund is also, however, entitled to double interest on the principal of Hughes's unpaid contributions pursuant to 29 U.S.C. § 1132(g)(2)(B)–(C). The Fund has not submitted any calculations of the interest that is due it. Accordingly, the Fund is ordered to submit, by April 14, 2017, a proposed final order of judgment for the full sum of damages to which it is entitled under 29 U.S.C. § 1132(g)(2), including the relevant interest. Such proposed final order is to be accompanied by a declaration and any necessary supporting exhibits demonstrating the basis for the Fund's interest calculations.

The Fund is further entitled to reasonable attorney's fees and costs of the action pursuant to 29 U.S.C. § 1132(g)(2)(D). The Fund may make an application to the Court for such fees and costs by April 28, 2017.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED, and plaintiff is entitled to $799,129.54 under 29 U.S.C. § 1132(g)(2)(A). Plaintiff shall submit a proposed final order of judgment with adequate supporting documentation for the full sum of damages to which it is entitled under 29 U.S.C. § 1132(g)(2), including the relevant interest, by April 14, 2017. Plaintiff may make an application to the Court for attorney's fees and costs by April 28, 2017. The Clerk of Court is respectfully requested to close Dkt. Nos. 33 and 39.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      March 31, 2017
            New York, New York